IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

MARIA SANCHEZ

        Plaintiff,

                                    Case No. 09-cv-1210 BB/RHS

    v.

AMERICAN FEDERATION OF STATE,
COUNTY, AND MUNICIPAL EMPLOYEES.

        Defendant.

## MEMORANDUM OPINION

On January 18, 2011, Defendant filed a Motion for Summary Judgment (Doc. 21) on Plaintiff's claims. Plaintiff, a former employee of Defendant union, has brought suit *pro se* against the union alleging discrimination, a hostile work environment, and constructive discharge. The Court finds that the record raises genuine issues of material fact regarding Plaintiff's claim of discrimination, but not on her constructive discharge claim. Therefore, Defendant's Motion for Summary Judgment is GRANTED with respect to Plaintiff's constructive discharge claim, and DENIED with respect to Plaintiff's Title VII discrimination claim. Further, since Defendant nowhere addresses Plaintiff's hostile work environment claim in its briefs, Plaintiff may proceed to trial on the hostile work environment claim as well.

## Factual and Procedural Background

Defendant American Federation of State, County, and Municipal Employees ("American Federation") employed Plaintiff, Maria Sanchez, as an organizer and council representative from April 1, 2004 to April 2, 2007. Plaintiff Sanchez filed a discrimination claim with the EEOC on July 16, 2007, alleging that American Federation had discriminated against her on the basis of gender

1

and age and constructively discharged her. She made these same allegations in her subsequent complaint as well as unlawful retaliation. Defendant American Federation deposed Plaintiff Sanchez to ascertain the factual basis for her claims. The deposition testimony, which Defendant does not dispute, (Doc. 21, at 2-6), stands as the primary evidence provided to the Court on this motion.

In her deposition, Plaintiff tells the story of a woman who, from the very inception of her tenure at American Federation, was greeted with discriminatory sneers and unequal treatment, a pattern that persisted until she ultimately resigned. According to Plaintiff, she was one of only two females employed by the union as a staff representative, otherwise surrounded by men. Plaintiff testified that some co-workers referred to her and the other female staff representative derogatorily as "Temo's girls." (Doc. 21, Ex. B, at 18-24.) According to Plaintiff, the nickname arose because some employees believed that Plaintiff was hired by an influential man named Temo Figueroa, and that as a woman she could not have been hired based on merit, but rather only because of the political tie. (*Id.*) Turning to Plaintiff's next instance of discrimination, Plaintiff also testified that she requested an office and supplies in 2004, and while all other similarly situated employees had an office, she did not receive either for at least a year: until late 2005 or early 2006. (*Id.* at 25, 40.)

In addition to the discrimination Plaintiff identified in her general work conditions, Plaintiff complained of discriminatory threats of suspension. Plaintiff testified that in February of 2006, when she was twenty minutes late to a rally, she was threatened with suspension even though other staff persons who had been late to rallies in the past had not been similarly threatened with suspension. (*Id.* at 60-65.) Further, Plaintiff testified that in August of 2004 her boss again threatened to suspend her without justification. Plaintiff testified that after she engaged in a heated conversation with a union member in which the union member threatened, without any apparent justification, to get Plaintiff fired, Plaintiff responded that the member should "do what [she] need[ed] to do."

2

According to Plaintiff, the member then filed a police report with false information (that the member had gotten Plaintiff fired). Plaintiff's boss subsequently concluded that Plaintiff had spoken disrespectfully to that member and so threatened to suspend Plaintiff. (*Id.* at 41-47.) Plaintiff was not actually suspended. (Doc. 21, at 2-3.) Plaintiff implies that the threat of suspension was without justification. All of these events happened before September of 2006.

Turning to events after September 2006, Plaintiff complained that she frequently heard a fellow employee, Rob Trombley, call women in the office "bitches" and "pussies" and other "sexist language," including during office meetings. (Doc. 21, Ex. B, at 106-07.) Plaintiff reported the language to her supervisor, Mr. Marquez, at least once. (*Id.* at 116-17.) The language did not abate under Mr. Marquez. (*Id.* at 117.) After Mr. Marquez was replaced by Mr. Jett as supervisor near the end of 2006, Plaintiff noticed a decrease in Mr. Trombley's use of this language. (*Id.* at 119-21.)

Plaintiff also complains that she was "kept out of the loop:" she was denied information she needed for her job and her supervisor passed her work assignments on to others without her consent. Plaintiff specifically identifies the closing of the Springer Correctional facility as the initial point when her supervisor began passing her work along to others, Rob Trombley and Sam Chavez, who left her "out of the loop." (*Id.* at 88-97.)

In addition to these incidents, Plaintiff testified that in order to undermine Plaintiff's job, American Federation staff representatives abused a procedure designed to help union members to file complaints against their representative. While members generally come forward on their own to report complaints about a staff person's representation, Plaintiff testified that Sam Chavez and Rob Trombley drafted complaints against Plaintiff on behalf of Plaintiff's members without consulting the members first, and then instigated the members to sign them, in order to undermine Plaintiff. (*Id.* at 51-60.) Plaintiff testified that these contrived reports were false. (*Id.*) Plaintiff's

3

supervisor then threatened to suspend her based on these fabricated reports. (*Id.*) Ultimately, American Federation decided not to pursue the suspension. (*Id.* at 60.)

Plaintiff further complains that she was passed over for promotion when American Federation created a new position for a staff representative in Albuquerque. Plaintiff claims that even though she had the most seniority, covered the largest area of any staff representative, and applied for the position properly, her boss, Mr. Marquez, gave the position to Rob Trombley, a less senior male with less extensive experience. Before Mr. Trombley assumed his new duties, however, a new executive director took over and eliminated the newly created position. (*Id.* at 99-105.)

Plaintiff Sanchez also testified to more subtle forms of harassment. The first involves an incident in 2006 when Plaintiff went to her supervisor, Mr. Marquez, to share some concerns about her work at Springer. After she shared her concerns and left, Mr. Marquez called her back into his office with Rob Trombley, Sam Chavez, and two other men as well. Mr. Marquez then asked Ms. Sanchez to repeat her concerns in the presence of these other individuals, even though Ms. Sanchez alleges that her concerns had nothing to do with any of them. (*Id.* at 124-27.) Ms. Sanchez felt harassed because Ms. Sanchez believed that the other men in the room did not like Ms. Sanchez, and their presence was not relevant to addressing her concerns.

Ms. Sanchez also claims that she suspected that her supervisor ordered Rob Trombley and Sam Chavez to follow her, claiming that a co-worker, Robert Chavez, told her that Rob Trombley and Sam Chavez were sent up to Las Vegas to watch her. She personally observed Robert Trombley and Sam Chavez in her home town on several occasions, but since they were from the same area as her, this did not surprise her. (*Id.* at 147.) However, she later observed Sam Chavez behind her on his motorcycle one time when they both left a meeting at the union hall, and he followed her into a mall parking lot. When she confronted Sam, he denied that he was following her. (*Id.* at 142-45.)

4

Finally, Plaintiff Sanchez testified that co-workers made hurtful comments about her age, noting that she was no longer of "child-bearing" age and that once at a staff meeting a co-worker made a joke about an old stripper and looked at Plaintiff. (*Id.* at 148-51.) Plaintiff testified that these working conditions, in the aggregate, negatively affected her health and she feared that if she stayed at the job, she "was going to get very sick." (*Id.* at 172, 179.) Consequently, Plaintiff resigned on April 2, 2007. Plaintiff Sanchez then filed a discrimination claim with the EEOC on July 16, 2007, alleging that American Federation had discriminated against her on the basis of gender and age and constructively discharged her. Ms. Sanchez then filed a complaint alleging the same, as well as unlawful retaliation, on December 29, 2009. On January 18, 2011, Defendant filed the motion for summary judgment (Doc. 21) now before the Court.[1]

## Discussion

Summary judgment is only proper if the pleadings, affidavits, and other exhibits show that there is no genuine issue of material fact and that on the undisputed facts, the law entitles the movant to judgment in his favor. *See* Fed. R. Civ. P. 56(c)(2). Material facts are those which "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court may not pass on the credibility of witnesses or weigh evidence, but rather must assess objectively whether factual issues exist for a jury to decide. *See id.* at 249. A dispute of facts is "genuine" if a reasonable jury could return a verdict for the nonmovant based on the nonmovant's version of the facts. *See id.* at 248. In assessing whether genuine issues of material fact exist, the court must view the facts and draw reasonable inferences in the light most favorable to the

---

[1]Plaintiff failed to respond to Defendant's motion for summary judgment. However, the Court must still assess whether Defendant has shown no genuine issue of material fact exists such that Defendant is entitled to judgment as a matter of law. *Reed v. Nellcor Puritan Bennett*, 312 F.3d 1190, 1193-95 (10th Cir. 2002).

nonmovant. *See Cole v. Ruidoso Mun. Sch.*, 43 F.3d 1373, 1379 (10th Cir. 1994). Plaintiff makes several claims under Title VII. Defendant first argues in response that Plaintiff failed to timely exhaust administrative remedies regarding several of the alleged employment actions; therefore, they must be disregarded. The Court addresses this argument first.

## I.      Timely Exhaustion Issue

Defendant first argues that some of Plaintiff's claims fall outside of the Title VII statute of limitations. A charge of discrimination must be filed within three hundred days of the alleged unlawful employment practice. 42 U.S.C. 2000e-5(e)(1) (2009); *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 105 (2002). Discrete discriminatory acts are not actionable under Title VII if they occurred more than three hundred days prior to filing. *Morgan*, 536 U.S. at 110, 113. However, "the statute [does not] bar an employee from using the prior acts as background evidence in support of a timely claim." *Id.* at 113. Plaintiff filed her charge of discrimination on July 16, 2007. (Doc. 21, Ex. A.) Thus, any act occurring before September 10, 2006 falls outside the three-hundred-day filing window. The following acts occurred outside of this window: (a) when an employee referred to Plaintiff derogatorily as "Temo's girl," (b) Plaintiff's request for an office and supplies in 2004, which she did not receive either until late 2005 or early 2006, (c) the suspension threatened in February of 2006 after Plaintiff was twenty minutes late to a rally, and (d) the suspension threatened in August of 2004 based on the heated conversation with a union member. Therefore, these four alleged discriminatory actions are not independently actionable, though they may serve as background evidence in support of Plaintiff's timely claims.

## II.     Timely Title VII Claims

A Title VII disparate treatment claim must meet the requirements of *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973). To make out a prima facie case, a plaintiff must show

that: (a) she belongs to a protected class; (b) she suffered an adverse employment action; and (c) the adverse employment action occurred under circumstances that give rise to an inference of discrimination. *Hysten v. Burlington N. & Santa Fe Ry.*, 296 F.3d 1177, 1181, 1182 (10th Cir. 2002). At the prima facie stage, the plaintiff's burden is "not onerous;" she must only raise an inference of discrimination. *Orr v. City of Albuquerque*, 417 F.3d 1144, 1149 (10th Cir. 2005). Plaintiff bases her claim of discrimination on her gender (female), thereby satisfying the protected class requirement. *See Ahern v. Shinseki*, 629 F.3d 49, 55 (1st Cir. 2010) (recognizing that women are a protected class). She argues that several actions constitute "adverse employment actions" and give rise to an inference of discrimination based on her age and gender. Defendant argues in response that the timely claims do not constitute "adverse employment actions."

### A.    Fabricated Negative Complaints & Usurpation of Duties

Plaintiff testified that American Federation staff representatives drafted complaints against Plaintiff and instigated at least two union members to sign these complaints in order to undermine Plaintiff. (Doc. 21, Ex. B, at 51-60.) Defendant responds that even though Plaintiff's supervisor threatened to suspend her based on these complaints, the supervisor never acted on this threat, and so there was no adverse employment action. (Doc. 21, at 8.) Defendant further notes that the threat of suspension was based on a legitimate reason: complaints from union members. (*Id.*) However, the crux of Plaintiff's claim of an adverse employment action is not the threatened suspension, but rather the fabricated complaints that were placed in Plaintiff's employment file. Thus, the issue is whether or not complaints fabricated by employees, based on discriminatory animus, and placed in the plaintiff's employment file constitute an adverse employment action.

The Tenth Circuit liberally defines the term "adverse employment action" and assesses each case individually. *Sanchez v. Denver Pub. Sch.*, 164 F.3d 527, 532 (10th Cir. 1998). Under

*McDonnell Douglas*, adverse employment actions include "hiring, firing, [and] failing to promote," but also those that carry a "significant risk of humiliation" or "damage to reputation" and "a concomitant harm to future employment prospects." *Hillig v. Rumsfeld*, 381 F.3d 1028, 1032-33 (10th Cir. 2004). In contrast, "a mere inconvenience" or change in job duties does not constitute an adverse employment action. *Medina v. Income Support Div.*, 413 F.3d 1131, 1136 (10th Cir. 2005).

In *Roberts v. Roadway Express*, the Tenth Circuit held that written warnings placed in the plaintiff's file constituted adverse actions where evidence showed that the more warnings an employee received, the more likely he or she was to be terminated for a further infraction, even though the warnings could not be used to support a termination after nine months. 149 F.3d 1098, 1104 (10th Cir. 1998). Further, the Tenth Circuit has favorably quoted from *Kim v. Nash Finch Company*, 123 F.3d 1046, 1060 (8th Cir. 1997). *See Roberts*, 149 F.3d at 1104. In *Kim*, the Eighth Circuit found an adverse employment action based on evidence that the employer had "papered" the plaintiff's file with negative reports, including written reprimands, reduced the plaintiff's job duties, gave him lower performance evaluations, and required the plaintiff to attend special additional training. 123 F.3d at 1060. The Eighth Circuit stressed that "[t]hese are the kind of serious employment consequences that adversely affected or undermined [the plaintiff's] position, even if he was not discharged, demoted or suspended." *Kim*, 123 F.3d at 1060.

Here, Plaintiff testified at her deposition that co-workers Sam Chavez and Rob Trombley, pursuant to the order of their boss, fabricated false complaints against Plaintiff and instigated at least two union members to sign them. (Doc. 21, Ex. B, at 51-60.) Defendant does not dispute this testimony. (Doc. 21, at 2, 3.) Plaintiff also testified that her boss began passing her work at the Springer Correctional facility along to these same two men, who kept Plaintiff uninformed about developments on her own assignment in order to undermine her work. (*Id.* at 88-97.) Plaintiff further

testified that Plaintiff's boss then threatened to suspend her based on the reports that Mr. Chavez and Mr. Trombley allegedly fabricated. (*Id.* at 51-60.) Taking Plaintiff's testimony as true, this evidence indicates that Plaintiff's file was papered with unjustified or manufactured complaints, that Plaintiff's job duties were reduced in an effort to undermine Plaintiff's work, and further, that the fabricated complaints had potentially "serious employment consequences" for Plaintiff. *Kim*, 123 F.3d at 1060. Thus, like in *Roberts*, these actions constitute an adverse employment action.

Further, the requirement that circumstances must give rise to an inference of discrimination "is a flexible one that can be satisfied differently in varying scenarios." *Plotke v. White*, 405 F.3d 1092, 1100 (10th Cir. 2005). There need only be a "logical connection" among the protected class status, adverse employment action, and the inference of discrimination. *Id.* Circumstances that can give rise to an inference of a discriminatory motive include "actions or remarks made by decisionmakers that could be viewed as reflecting a discriminatory animus." *Id.* at 1101 (quoting *Chertkova v. Connecticut Gen. Life Ins.*, 92 F.3d 81, 91 (2d Cir. 1996)). In *Plotke*, the Tenth Circuit found sufficient evidence to infer a discriminatory motive where evidence showed that: (a) the plaintiff was the only female on staff in her position and was hired largely due to pressures to hire a woman; (b) the plaintiff's duties were less substantive than her male counterpart; (c) many of her male colleagues called her by her first name rather than "Dr."; and (d) she was removed from a project prior to completion despite her satisfactory work. *Id.* at 1101-02.

Here, taking all inferences in the light most favorable to Plaintiff, her deposition testimony provides enough evidence to infer that Rob Trombley and Sam Chavez had a discriminatory motive in fabricating complaints about Plaintiff. Notably, Plaintiff identified specific comments "that could be viewed as reflecting a discriminatory animus." *Id.* at 1101. Plaintiff testified that Rob Trombley would walk around the office calling women "bitches," "pussies," and other "sexist language."

(Doc. 21, Ex. B, at 106-07.) Additionally, Plaintiff testified that she and one other staff member, Lori Ortega, were the only two female staff representatives, and the male representatives singled these women out because of their gender, calling them "Temo's girls." (*Id.* at 18-21.); *see also Morgan*, 536 U.S. at 113 (noting that untimely acts may be used as background facts in support of a timely claim). Finally, Plaintiff also testified that her responsibilities at the Springer Correctional facility were delegated to two men, Rob Trombley and Sam Chavez. (*Id.* at 88-97.) Therefore, like the plaintiff in *Plotke*, the record contains sufficient evidence to support an inference of a discriminatory motive.

Where a plaintiff has established a prima facie case under Title VII, the defendant then must articulate a legitimate, non-discriminatory reason for the adverse action to raise a valid defense to the plaintiff's prima facie case. *Jaramillo v. Colo. Judicial Dep't*, 427 F.3d 1303, 1307 (10th Cir. 2005). Here, Defendant has cited no reason for the solicited complaints. Therefore, Plaintiff has established a valid prima facie claim under Title VII based on these incidents such that summary judgment against Plaintiff is improper.

**B.     The Promotion Issue**

Plaintiff further complains that she was passed over for promotion when American Federation created a new position for a staff representative in Albuquerque. Plaintiff claims that even though she had the most seniority, possessed experience covering the largest area of any staff representative, and applied for the position properly, the executive director gave the position to Rob Trombley, a less senior male with less extensive experience, instead of her. (*Id.* at 99-105.) Defendant responds that the position was eliminated before it was filled. (Doc. 21, at 8.) According to Plaintiff's deposition testimony, Mr. Trombley was selected for the position, but before Mr.

Trombley assumed his new duties, a new executive director took over and eliminated the newly created position. (Doc. 21, Ex. B, at 100-01.)

Under Tenth Circuit law, failure to promote an employee constitutes an adverse employment action. *Hillig v. Rumsfeld*, 381 F.3d 1028, 1032-33 (10th Cir. 2004). Plaintiff must show that: (1) she is a member of a protected class; (2) she applied for and was qualified for the particular position; (3) she was not promoted despite her qualifications; and (4) the position was filled or remained open after she was rejected. *Jaramillo v. Colo. Judicial Dep't*, 427 F.3d 1303, 1306-07 (10th Cir. 2005) (citing *Cross v. The Home Depot*, 390 F.3d 1283, 1286 (10th Cir. 2004)); *see also Perry v. Woodward*, 199 F.3d 1126, 1135-41 (10th Cir. 1999). If the plaintiff establishes this prima facie case, the presumption of a discriminatory motive arises. *Jaramillo*, 427 F.3d at 1307. Notably, if a plaintiff shows that after being passed over for the promotion, someone outside of the protected class was chosen instead, that bolsters an inference of discrimination. *See Notari v. Denver Water Dep't*, 971 F.2d 585, 588 (10th Cir. 1992); *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000).

Sufficient evidence exists here to find the prima facie case satisfied. Plaintiff testified that she was passed over for promotion when American Federation created a new position for a staff representative in Albuquerque. Plaintiff claims that even though she had the most seniority, covered the largest area of any staff representative, and applied for the position properly, the executive director gave the position to Rob Trombley, a less senior male with less extensive experience, instead of her. (Doc. 21, Ex. B, at 99-105.) As there is evidence that Plaintiff was qualified, properly applied, and yet someone outside the protected class was chosen instead of her, the evidence supports a failure-to-promote adverse employment action and an inference of discrimination.[2]

---

[2] While Defendant might have established a valid defense if it had argued in its brief and provided evidence that the open position was merely a lateral transfer, Defendant made no such argument.

Defendant stresses that the position was eliminated before Mr. Trombley actually assumed his new duties. However, actions that are "by their nature adverse" are actionable adverse actions even if subsequently withdrawn. *See Roberts v. Roadway Exp. Inc.*, 149 F.3d 1098, 1104 (10th Cir. 1998) (referring to suspensions and termination). Thus, "the mere fact that an employer retracts an adverse employment action does not absolve the employer from liability if the initial employment decision was based on an unlawful, discriminatory motive." *Kennedy v. Gen. Motors Corp.*, 226 F. Supp. 2d 1257, 1265 (D. Kan. 2002). In *Terry v. Gallegos*, a court found an adverse employment action and an inference of discrimination where a plaintiff applied for two promotions, which each time were subsequently cancelled rather than filled. 926 F. Supp. 679, 709-10 (W.D. Tenn. 1996). The court found the action adverse even though the positions were ultimately not filled by anyone. *Id.* Further, the court held that circumstantial evidence supported the inference of discrimination because the defendant's proffered reasons for some cancellations appeared pretextual, and the defendant offered no explanation at all for the other cancellations. *Id.* at 710 & n.74. Here, as in *Roberts* and *Kennedy*, because the failure to promote for a discriminatory reason is by its nature adverse, subsequent retraction of the adverse action does not insulate Defendant from liability.[3]

Finally, Defendant fails to cite any reason at all for the failure to promote Plaintiff. Therefore, Plaintiff has established a valid prima facie claim under Title VII for discriminatory failure to promote such that summary judgment against Plaintiff is improper.

_____

[3] This case is unlike *Bowie v. Ashcroft*, in which the D.C. District Court found no adverse employment action where a vacancy announcement was rescinded *before* anyone outside the protected class was chosen to fill the position, because here Plaintiff testified that the new position was withdrawn only *after* a male applicant had been chosen to fill the position. 283 F. Supp. 2d 25, 31 (D.D.C. 2003) (citing *Morgan v. Federal Home Loan Mortgage Corp.*, 172 F. Supp. 2d 98, 112-113 (D.D.C. 2001) ("When a government agency cancels a vacancy announcement and no one outside the protected class is hired to fill the position, the plaintiff cannot establish her prima facie case.")

### C.      Remaining Allegations of Discrete Adverse Employment Actions

Plaintiff alleges two additional incidents of harassment. First, Plaintiff complains that when she went to her boss to discuss a job-related concern, her boss called in three males to witness her complaints, men who Plaintiff believes disliked her. Second, Plaintiff testified that two of her colleagues were ordered to follow her, a claim she supports with testimony that she saw one of them following her out of work one day and that she saw both colleagues in her home town frequently.

Once again, adverse employment actions under Title VII include those that carry a "significant risk of humiliation" or "damage to reputation" and "a concomitant harm to future employment prospects." *Hillig v. Rumsfeld*, 381 F.3d 1028, 1032-33 (10th Cir. 2004). However, "a mere inconvenience" does not constitute an adverse employment action. *Medina v. Income Support Div.*, 413 F.3d 1131, 1136 (10th Cir. 2005). Here, while the co-worker confrontation might have humiliated Plaintiff, it did not carry a "concomitant harm to future employment prospects." Further, the circumstantial evidence of stalking, while reprehensible if true, also carried no risk to Plaintiff's future employment prospects. Therefore, these claims, while potentially relevant to Plaintiff's constructive discharge or hostile work environment claims, do not constitute "adverse employment actions." Thus, they are not actionable under Title VII as independent acts of discrimination.

### D.      Constructive Discharge Claim

Plaintiff also claims in her complaint that she was constructively discharged. (Doc. 1, at 3.) Defendant argues that Plaintiff's constructive discharge claim is only based on three factual allegations: (1) that a co-worker sometimes glared at Plaintiff; (2) that Plaintiff attended three meetings where she felt out of the loop because she was unaware of some matters that were discussed; and (3) that there generally was an unfriendly atmosphere. (Doc. 21, at 10.) However, this characterization is based on an artificially constrained reading of Plaintiff's actual claim, as the

complaint nowhere limits the constructive discharge claim to these particular events. Reading Plaintiff's *pro se* complaint liberally, *see Haines v. Kerner*, 404 U.S. 519, 520 (1972); *Kay v. Bemis*, 500 F.3d 1214, 1218 (10th Cir. 2007), the Court construes Plaintiff's constructive discharge claim as one based on all of the actionable allegedly harassing incidents that Plaintiff identified.

A plaintiff can establish constructive discharge either by showing that (a) the employer by its discriminatory acts effectively forced the plaintiff to choose between resignation or termination, or (b) the working environment was so hostile that a reasonable person in the employee's position would feel compelled to resign. *Hall v. U.S. Dep't of Labor*, 476 F.3d 847, 860-61 (10th Cir. 2007); *see also Stremple v. Nicholson*, 289 Fed. Appx. 571, 573 (3d Cir. 2008). If established, a constructive discharge constitutes an adverse employment action. *Fischer v. Forestwood Co.,* 525 F.3d 972, 980 (10th Cir. 2008). Whether a constructive discharge occurred is a question of fact. *Strickland v. United Parcel Serv., Inc.*, 555 F.3d 1224, 1228 (10th Cir. 2009). The Court analyzes both kinds of constructive discharge.

### 1. Forced Resignation Constructive Discharge Claim

A plaintiff can show a forced resignation constructive discharge with direct evidence of an explicit request to resign or else face termination or a demotion. *See Parker v. Bd. of Regents of Tulsa Jr. College*, 981 F.2d 1159, 1162 (10th Cir. 1992); *Cockrell v. Boise Cascade Corp.*, 781 F.2d 173, 178 (10th Cir. 1986) (forced choice between resignation and demotion sufficed to bring issue of constructive discharge before the jury). Constructive discharge factors include whether the plaintiff: (1) was given some alternative to resignation; (2) understood the nature of the choice she was given; (3) was given a  reasonable time in which to choose; and (4) was permitted to select the effective date of resignation). *Parker*, 981 F.2d at 1162. In this context, courts also consider whether the employee explored alternative options before deciding that resigning was the only option.

14

*Easton*, 325 F.3d at 445. A "resignation will be involuntary and coerced when the totality of the circumstances indicate [the lack of an] opportunity to make a free choice." *Narotzky v. Natrona County Mem'l Hosp. Bd. of Trs.*, 610 F.3d 558, 566 (10th Cir. 2010) (quoting *Parker v. Bd. of Regents of Tulsa Jr. College*, 981 F.2d 1159, 1162 (10th Cir. 1992)).

Here, nothing in the deposition testimony indicates that Plaintiff's supervisors threatened to fire her, encouraged her to resign, demoted her or reduced her pay, involuntarily transferred her to an undesired position, or changed her job duties negatively. While there is evidence that two co-workers fabricated false complaints against her to paper her file with negative reports and that she was passed over for promotion, that alone does not rise to the level necessary to show constructive discharge. Therefore, Plaintiff's forced resignation constructive discharge claim must fail.

### 2.    *Hostile Work Environment Constructive Discharge Claim*

"A plaintiff who alleges a compound claim–a constructive discharge claim premised on  a hostile work environment–must show working conditions so intolerable that a reasonable person would have felt compelled to resign." *Montes v. Vail Clinic, Inc.*, 497 F.3d 1160, 1174 n.19 (10th Cir. 2007) (quoting *Pa. State Police v. Suders*, 542 U.S. 129, 141 (2004)). "A finding of constructive discharge is supported by evidence that an employee has resigned, rather than waiting to be fired, because of unreasonably harsh conditions that have been applied to him in a discriminatory fashion." *Spulak v. K-Mart Corp.*, 894 F.2d 1150, 1154 (10th Cir. 1990). This is a high, but not insurmountable, standard. *See Fischer v. Forestwood Co.,* 525 F.3d 972, 980 (10th Cir. 2008) (describing the plaintiff's burden as "substantial"). Courts look at the totality of the circumstances in determining the voluntariness of a plaintiff's resignation. *Lighton v. Univ. of Utah*, 209 F.3d 1213, 1222 (10th Cir. 2000). "Whether working conditions were so intolerable and discriminatory as to justify a reasonable employee's decision to resign is a factual question for the jury." *Schnidrig v.*

*Columbia Mach., Inc.*, 80 F.3d 1406, 1411 (9th Cir. 1996); *see also Strickland v. United Parcel Serv., Inc.*, 555 F.3d 1224, 1229 (10th Cir. 2009).

To support a constructive discharge claim based on harassment, the plaintiff must show more severe harassment than the minimum required to support a hostile work environment claim. *See Suders*, 542 U.S. at 143, 146; *Hall v. U.S. Dep't of Labor*, 476 F.3d 847, 851 (10th Cir. 2007). "For a hostile environment claim to survive a summary judgment motion, a plaintiff must show that a rational jury could find that the workplace was permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *MacKenzie v. City & County of Denver*, 414 F.3d 1266, 1280 (10th Cir. 2005) (quoting *Penry v. Fed. Home Loan of Topeka*, 155 F.3d 1257, 1261 (10th Cir. 1998)).

In assessing the severity and pervasiveness of the discrimination, the Court considers "such factors as 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Chavez v. New Mexico*, 397 F.3d 826, 832 (10th Cir. 2005) (quoting *O'Shea v. Yellow Technology Services, Inc.*, 185 F.3d 1093, 1098 (10th Cir. 1999)). Further, "facially neutral abusive conduct can support a finding of gender animus sufficient to sustain a hostile work environment claim when that conduct is viewed in the context of other, overtly gender-discriminatory conduct." *O'Shea*, 185 F.3d at 1097. The Tenth Circuit has found sporadic harassing comments insufficient to show constructive discharge. *Sanchez v. Denver Pub. Sch.*, 164 F.3d 527, 530, 534 (10th Cir. 1998); *Penry*, 155 F.3d at 1261-63, 1264.

In the Tenth Circuit, discriminatory remarks must be coupled with an aggravating factor. *See Fischer v. Forestwood Co.*, 525 F.3d 972, 980-82 (10th Cir. 2008) (noting that discriminatory

16

remarks and requests to resign coupled with reduction of job duties and inadequate training constituted constructive discharge, but merely making discriminatory remarks and making the plaintiff's work conditions somewhat uncomfortable did not suffice). Aggravating factors might include a perceived demotion or reduction of job responsibilities. *James v. Sears, Roebuck, &* Co., 21 F.3d 989, 993 (10th Cir. 1994).

Further, the Tenth Circuit has found enough evidence of constructive discharge even absent evidence of any discriminatory remarks where there is proof of disparate treatment and that the employer engaged in acts designed to frustrate the plaintiff's progress at work. *See Irving v. Dubuque Packing Co.*, 689 F.2d 170, 171-73 (10th Cir. 1982) (employer passed black employee over for promotion despite qualifications, untruthfully told the plaintiff he was making the same amount of money as his non-black co-workers, gave the plaintiff extra work, and unfairly publicly blamed the plaintiff for others' mistakes). The Tenth Circuit has found adequate proof of constructive discharge based on evidence that: (a) the plaintiff was singled out for additional counseling even though her performance was comparable to several co-workers, (b) she was told that her job performance was unacceptable, (c) she was not provided support to perform her job when she requested it, and (d) her supervisors required her to make commitments that would be very difficult to live up to. *Strickland v. United Parcel Serv., Inc.*, 555 F.3d 1224, 1229 (10th Cir. 2009).

Here, Plaintiff's testimony regarding the alleged gender-based harassment relies on comments made toward other women, rather than directly to Plaintiff, coupled with her allegations of being followed by co-workers, "kept out of the loop," passed over for promotion, and having unwarranted complaints against her placed in her file.[4] Plaintiff testified that she heard Mr.

---

[4] Plaintiff also alleges a hostile work environment claim. (Doc. 1, at 2.) Since Defendant nowhere addresses this claim, the Court does not consider it in this opinion. Therefore, Plaintiff may proceed to trial on this issue.

Trombley, her co-worker, frequently call women in the office "bitches" and "pussies" and other "sexist language," including during office meetings. (Doc. 21, Ex. B, at 106-07.) Plaintiff reported the language at least once to her supervisor, Mr. Marquez, and then after Mr. Marquez left the job, to her subsequent supervisor, Bruce Jett. (*Id.* at 116-17, 119.) Plaintiff also testified that while Mr. Marquez took no remedial action, after talking to Mr. Jett, the frequency of the sexist language decreased. (*Id.* at 119.) Finally, Plaintiff testified that her working conditions had negatively affected her health. (*Id.* at 172, 179.) Plaintiff resigned on April 2, 2007.

Whether there is sufficient evidence of constructive discharge presents a very close call since there is evidence of pervasive sexist language, co-workers "stalking" the plaintiff, co-workers withholding the information that the plaintiff needed to complete her job duties, her boss passing her over for promotion, and co-workers papering her employment file with false complaints. Further, Plaintiff testified that these conditions began to interfere with her work performance by negatively affecting her health. *See Chavez v. New Mexico*, 397 F.3d 826, 832 (10th Cir. 2005) (quoting *O'Shea v. Yellow Technology Services, Inc.*, 185 F.3d 1093, 1098 (10th Cir. 1999)) (noting that courts should consider whether harassing conduct "unreasonably interfere[d] with an employee's work performance"); *Fitzgerald v. Henderson*, 251 F.3d 345, 350-51, 367 (2d Cir. 2001) (enough evidence of constructive discharge where supervisor unfairly criticized the plaintiff's work, was "hostile and increasingly abusive" toward the plaintiff, and eventually the plaintiff became so distraught that she had to take sick leave and then resigned). On balance, the Court finds that this evidence suffices to raise a question of fact on Plaintiff's constructive discharge claim.

However, to hold an employer liable for one employee's sexual harassment of another employee, a plaintiff must provide evidence supporting one of three alternative liability theories: "(1) [that] the acts are committed by an employee acting 'within the scope of employment'; (2)

[that] the employer was negligent or reckless; or (3) [that] the employee purported to act or to speak on behalf of the employer." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 673 (10th Cir. 1998).

An employee's actions fall within the scope of employment where the employee's conduct is "the kind the employee is employed to perform," "occurs substantially within the authorized time and space limits," and "is actuated, at least in part, by a purpose to serve the employer." *McInnis v. Fairfield Cmtys., Inc.*, 458 F.3d 1129, 1136 n.2 (10th Cir. 2006) (quoting *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 543-44 (1999)). Here, the record contains no evidence that Mr. Trombley's harassing language was authorized within the scope of his employment duties. There is no evidence that he invoked his position at the union when making these comments or that he suggested that the union supported his use of derogatory language. Consequently, Plaintiff cannot hold Defendant American Federation liable under the first prong of the *Adler* test.

Further, to show that the employer was negligent or reckless regarding an employee's discriminatory actions, a plaintiff must prove that the employer knew or should have known of the hostile work environment and failed to adequately respond to it. *Adler*, 144 F.3d at 673. An adequate response is one that is prompt and effective, one that is "reasonably calculated to end the harassment." *Id.* at 676 (quoting *Ellison v. Brady*, 924 F.2d 872, 882 (9th Cir. 1991)). Here, there is evidence that Plaintiff did inform both Mr. Marquez and Mr. Jett about Mr. Trombley's sexist comments. However, Plaintiff testified that the discriminatory language began to abate after Mr. Jett replaced Mr. Marquez as her supervisor several months before she left, though she hesitates about how significantly the language decreased. In the Tenth Circuit, a plaintiff cannot prevail on a hostile work environment claim if the employer promptly and effectively addressed the situation leading to the hostile work environment. *See id.* at 673.

Here, there is undisputed evidence that Plaintiff's supervisor at least partially dealt with the problem of harassing language at work, and there is no evidence that Plaintiff's supervisor knew that her co-workers withheld pertinent information from her. The remaining evidence (of "stalking," the failure to promote, and the papering of Plaintiff's employment file), standing alone, does not suffice to support a constructive discharge claim because the evidence of stalking is too weak, and the other two events, standing alone, do not constitute constructive discharge. Therefore, Plaintiff has failed to adduce enough evidence to support a claim of constructive discharge, so the Court finds summary judgment proper on this claim.

### E.    Retaliation Claim

Plaintiff makes a final claim in her complaint, that she suffered unlawful retaliation. (Compl. at 1.) However, there is no evidence in the record supporting this claim, and therefore the Court grants summary judgment on Plaintiff's retaliation claim.

### III.    ADEA Claim

Under the Age Discrimination in Employment Act (ADEA), an employer may not "discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1) (2006). When a plaintiff claims disparate treatment, as here, relying upon circumstantial evidence to show unlawful discrimination, the plaintiff must establish a prima facie case of discrimination under the *McDonnell Douglas* framework. These requirements were outlined above. *See supra* Part II. Plaintiff was fifty-eight years old when she filed the complaint in 2009, and therefore she was between the ages of fifty-three to fifty-six when she worked for Defendant American Federation, from 2004 to 2007. Therefore, Plaintiff is a member of a protected class under the ADEA, which protects individuals over age forty. 29 U.S.C. § 631 (2006).

20

However, Plaintiff has not shown an adverse employment action based on age, and therefore her ADEA claim fails. Adverse employment actions are those that "disadvantage" the employee. *Burrus v. United Tel. Co. of Kan., Inc.*, 683 F.2d 339, 343 (10th Cir. 1982). They include those acts that carry a "significant risk of humiliation" or "damage to reputation" and "a concomitant harm to future employment prospects." *Hillig v. Rumsfeld*, 381 F.3d 1028, 1032-33 (10th Cir. 2004).

Plaintiff's only age-related complaints are that one co-worker observed that she was no longer of "child-bearing" age and that once at a staff meeting another co-worker made a joke about an old stripper and looked at Plaintiff. (*Id.* at 148-51.) Plaintiff has testified that ageist comments were directed specifically at her. However, evidence of a few isolated age-related jokes do not rise to the level of creating a "significant risk of humiliation," "damage to reputation," or a "harm to future employment prospects." *Cf. MacKenzie v. Denver*, 414 F.3d 1266, 1280 (10th Cir. 2005) (warning courts in judging hostile work environment claims to "filter out claims attacking the ordinary tribulations of the workplace, such as the sporadic use of age-related jokes, and occasional teasing"). Consequently, Plaintiff has not established a prima facie case under the ADEA.

Dated: May 04, 2011

Bruce D Black _____

**BRUCE D. BLACK**
**UNITED STATES DISTRICT JUDGE**

21